IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 02-608

_____

| | |
|---|---|
| BARBARA WILLIAMS, | ) |
| | ) |
| Plaintiff and Appellant, | ) |
| | ) |
| v. | )         O R D E R |
| | ) |
| UNION FIDELITY LIFE INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant and Respondent | ) |
| and Cross-Appellant. | ) |

_____

On September 9, 2005, this Court issued an Opinion in this case wherein we affirmed the District Court's denial of both parties' motions for summary judgment and for judgment as a matter of law. In addition, we affirmed the District Court's denial of Barbara Williams' (Barbara's) motion to exclude her husband Clarence's medical records and the granting of Barbara's motion to exclude evidence that Barbara and Clarence filed for bankruptcy. Because we also held that the District Court erred in instructing the jury, we reversed and remanded for a new trial.

Union Fidelity Life Insurance Company (Union Fidelity) has now petitioned this Court for a rehearing contending that the Court "made, or appeared to make, erroneous fact findings and did not address a key issue essential to proper retrial of the case." Union Fidelity asks that we correct the fact findings and clarify the jury instruction issue or, in the alternative, to reverse our remand of this case. Barbara's response was not timely.

In its Petition for Rehearing, Union Fidelity first objects to our using the term "recurrent" in our Opinion when discussing Clarence's renal cell carcinoma. However, in his

1

November 2, 1999 deposition, Dr. Brock Whittenberger, Clarence's medical oncologist, repeatedly referred to a "recurrence" of Clarence's cancer:

> A. [Dr. Whittenberger] . . . We discussed the fact that sometimes patients with cancer who are doing well, even though they have a high likelihood of having a *recurrence*, will sometimes in their own mind think that they're not going to have a *recurrence* of the cancer. That's kind of a coping mechanism that people have.

Dr. Whittenberger Dep. p. 9 (emphasis added).

> A. [Dr. Whittenberger] Well, the extent of the metastatic disease in Mr. William's case is solitary metastasis, has a more favorable outcome. The patient's performance status, their ability to function normal activities of life, he had a good performance status. And just the pace of the disease over time. If it *recurs* one time, but then you have a disease-free interval before it comes back a second time, that's often a predictor of longer survival.

Dr. Whittenberger Dep. p. 13 (emphasis added).

> Q. [Mr. Bishop] And it was your testimony, I believe, that you had some concern at that point that he might have a *recurrence*.
> A. [Dr. Whittenberger] Yes.

Dr. Whittenberger Dep. pp. 51-52 (emphasis added).

> A. [Dr. Whittenberger] . . . Most of the time if patients have a *recurrence* of their cancer it's obvious from their symptoms or physical examination.

Dr. Whittenberger Dep. p. 55 (emphasis added).

> Q. [Mr. Bishop] And he lived for 11 years, and then there was the type of *recurrence.*
> A. [Dr. Whittenberger] That's correct.
>     . . . .
> Q. The level of problem that Clarence Williams was showing, and particularly after you treated it, was not going to kill him absent some later *recurrence*.
> A. That's correct, although he had some complication from the treatment.

Dr. Whittenberger Dep. p. 62 (emphasis added).

In addition, Dr. John Terry, Clarence's radiation oncologist, also referred to a "recurrence" of Clarence's cancer:

Q. [Mr. Bishop] You talked about symptom control and inhibiting further growth of the tumor in answer to Mr. Forsythe's questions. And as I recall, I tried to make a note, that one of the things you took pains to explain to them is that there could be a *reoccurrence* [sic] in another location of another tumor; is that correct?
A. [Dr. Terry] Correct.

Dr. Terry Dep. p. 22 (emphasis added).

Q. [Mr. Bishop] And as I take it, in this case where we have *recurrence* of the disease from ten years ago, you would be talking about a treatment goal of controlling or eliminating the symptoms, controlling further growth of this particular tumor, and then we will just see how it goes from here on out?
A. [Dr. Terry] Correct.

Dr. Terry Dep. pp. 29-30 (emphasis added).

While Union Fidelity is correct that it would have been more accurate to include the word "metastatic" when referring to Clarence's renal cell carcinoma, it was not incorrect to include the word "recurrent" because Clarence had been diagnosed with renal cell carcinoma ten years prior, he had been treated, he had lived symptom-free for those ten years and he was now again diagnosed with renal cell carcinoma.

Second, Union Fidelity objects to the phrase in our Opinion that "Clarence underwent a successful course of radiation therapy which shrunk and neutralized the tumor." Union Fidelity asserts that the radiation therapy was not successful and that it had not been neutralized.

Dr. Terry stated in his deposition that the purpose of the radiation therapy was to control Clarence's symptoms and to inhibit further growth of the tumor. Dr. Terry Dep. pp. 9-10. Dr. Terry further stated that a chest X-ray performed in November 1996 (six months after radiation therapy had been concluded) showed that the "mass in the chest is unchanged," "in essence, a stable picture." Dr. Terry Dep. p. 19. Hence, the radiation

3

therapy had been successful in producing the desired result--inhibiting further growth of the tumor. Moreover, both Dr. Terry and Dr. Whittenberger stated that the tumor had actually shrunk slightly.

> Q. [Mr. Bishop] In your answers to the questions earlier I made a note on the May 29, 1996 CT, the size of the mass was 4 by 4 by 6.
> A. [Dr. Terry] Right.
> Q. And then in November of 1996 there was a radiology report which indicated 3 by 5 centimeters.
> A. Correct.
> Q. My understanding of those numbers may be incorrect, but my impression that that's somewhat smaller, is that right?
> A. Correct.

Dr. Terry Dep. pp. 26-27.

> Q. [Mr. Forsythe] What was the effect of the treatment?
> A. [Dr. Whittenberger] Well, he had partial shrinkage of the mass in his lung. It went from about five centimeters to three centimeters.

Dr. Whittenberger Dep. p. 26.

> A. [Dr. Whittenberger] . . . the CAT scan on 11-18-96 showed a 5x3 centimeter mass in the left upper lung. And Dr. Bruschwein, the radiologist, commented that the mass had decreased in size compared to 3-22-96 . . . .
> Q. [Mr. Forsythe] What did that CAT scan then tell you about the state of his disease?
> A. Well, it suggested that he actually did not have *progressing* renal cell carcinoma.
> Q. Was it suggesting the tumor hadn't grown or –
> A. That's correct.

Dr. Whittenberger Dep. pp. 31-32 (emphasis added).

> A. [Dr. Whittenberger] . . . I can remember [Barbara and Clarence] being encouraged that the CAT scans and the chest x-rays *weren't showing progression* and that his – you know, *he wasn't having signs or symptoms of progression at other sites.*

Dr. Whittenberger Dep. p. 40 (emphasis added).

Third, Union Fidelity objects to the phrase in our Opinion that Dr. Whittenberger "concluded Clarence's treatment with a closing visit . . ." arguing that while Dr. Whittenberger did not see Clarence again, his treatment was not concluded. However, it follows that if Dr. Whittenberger did not see Clarence again and did not set up any follow-up appointments for Clarence, then Dr. Whittenberger's treatment of Clarence had concluded.

> Q. [Mr. Bishop] Does your note indicate, then, that as a part of that telephone conversation with Clarence Williams you set up a repeat visit for him or a return appointment?
> A. [Dr. Whittenberger] I don't know. It doesn't say in the note what the plan was.
> Q. All right. And in the absence of any plan or any appearance of a fail to show, would the common practice be to understand that he was set up on a p.r.n. basis to return as necessary?
> A. No, the usual practice would be to make arrangements for the patient to come back on a regular visit schedule.
> Q. I see. Just kind of check and see what's going on.
> A. Right.
> *Q. All right. And but there's no indication that there was a schedule set up.*
> *A. No.*
> *Q. And, in fact, Mr. Williams never did come in to see you again.*
> *A. That's correct.*

Dr. Whittenberger Dep. pp. 53-54 (emphasis added).

Nevertheless, while our recitation of facts in ¶ 36 is not erroneous as Union Fidelity states, we will amend our Opinion and delete ¶ 36 to prevent it from becoming the law of the case. As we stated in ¶ 41 of our Opinion, the jury should be allowed to view Clarence's medical records for themselves and make their own determinations as to Clarence's condition at the time he signed the Certificate of Insurance.

Fourth, and finally, Union Fidelity contends that the Opinion as written will leave the trial court confused on how to instruct the jury regarding the standard to impose in determining whether Clarence made a misrepresentation in his insurance application. Union Fidelity requests that we "either clarify the misrepresentation standard for retrial or find that Instruction 21 was harmless error." While we do not agree that giving Instruction 21

regarding the use of an objective test was harmless error, we agree that clarification of the standard for retrial is necessary.

The Certificate of Insurance that Clarence signed stated that all statements made in the Application for Insurance are considered to have been made "to the best of [his] knowledge and belief." Hence, any instruction on retrial should reflect Clarence's subjective knowledge—i.e., what he knew and what he believed. While we do not intend to draft a specific instruction for the trial court, we will amend our Opinion to indicate that whatever instruction the parties and the court decide to use should reflect Clarence's subjective knowledge—i.e., what he knew and what he believed, without attempting to balance either as a matter of law. In other words, it would be up to the fact finder on retrial to decide what Clarence knew versus what he believed. Therefore,

IT IS ORDERED that Union Fidelity's Petition for Rehearing is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that our Opinion in this case, *Williams v. Union Fidelity Life Insurance Company*, 2005 MT 221, be withdrawn with an amended Opinion to follow.

IT IS FURTHER ORDERED that the Clerk of this Court give notice of this Order by mail to all counsel of record, the District Court, the Pacific Reporter and the Montana Reports.

DATED this _____ day of October, 2005.

_____
Chief Justice

_____

_____

_____

6

_____
Justices